IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| DIANNA LYNN LAMB, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 1:10CV323-SRW |
| ) | (WO) |
| MICHAEL J. ASTRUE, Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF OPINION**

Plaintiff Dianna Lynn Lamb brings this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a decision by the Commissioner of Social Security ("Commissioner") denying her application supplemental security income under the Social Security Act. The parties have consented to entry of final judgment by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Upon review of the record and briefs submitted by the parties, the court concludes that the decision of the Commissioner is due to be affirmed.

**BACKGROUND**

Plaintiff was born on April 28, 1965, and left school after ninth grade. She worked briefly as a sitter for an elderly person in 2000 and 2001, but has no other work experience. (R. 27-28, 32, 34, 103. 112, 122, 155). In November 2005, the Geneva County court ordered plaintiff to attend substance abuse treatment at South Central Alabama Mental Health Center

(SCAMHC).[1] Plaintiff testified that she attended 34 classes in 2006. (R. 39; see also Exhibit 2F).[2] On February 28, 2006 (protective filing date), two months after she entered the substance abuse program, plaintiff filed the present application for Supplemental Security Income, alleging that she became disabled on October 30, 2001, due to high blood pressure, neck and back problems, chronic pain, panic attacks and anxiety problems. (R. 97-105, 106, 111).[3] Disability Determination Services sent plaintiff to J. Walter Jacobs, Ph.D., for a consultative psychological evaluation on April 11, 2006 and to Dr. Vijay Vyas for a consultative physical examination on April 13, 2006. (Exhibits 3F, 4F). Plaintiff complained to Dr. Jacobs of panic attacks, reporting that she "experiences anxiety in social situations,

---

[1] At the hearing, plaintiff testified that the Geneva County court ordered her to go to drug treatment because, although she does not use marijuana, she "was caught with a marijuana joint in [her] jacket." (R. 28, 39). In a drug use questionnaire she completed on May 8, 2006, however, plaintiff wrote that she was going to the drug classes because she had drug tests that were positive for methamphetamine. (R. 124)("I had a misdemeanor charge for poss. of marijuana. It was not my marijuana. I have never used that drug. I got put in the CRO [program] in Geneva, Al. + had to have drug tests. I failed a few for meth, that's why I'm going to class."). During her intake interview at SCAMHC on November 23, 2005, plaintiff indicated that she had used methamphetamine "3-4 x week or daily" for "close to 1 yr" and that she had tried marijuana a couple of times twenty years previously. (R. 147); see also R. 123, drug use questionnaire ("I used drugs every day for at least one year. Maybe two years. For a couple of years before that I used only once in a while.").

[2] The record does not include any progress notes regarding plaintiff's substance abuse treatment at SCAMHC. However, plaintiff indicated in her May 8, 2006, drug use questionnaire that she was then in the "drugs class program," but that it "is very hard for [her] to go to these drug classes and be around people even for a few hours a week" due to her nerves. (R. 124). In April 2006, she told Dr. Jacobs, the consultative psychologist that "[s]he is taking an intensive outpatient drug program which occupies her days." (R. 153).

[3] In the disability report she completed in support of her application, the only treatment provider plaintiff identified was Dr. Steven J. Davis, Sr., who saw plaintiff on September 26, 2005 for complaints of neck pain, insomnia and high blood pressure. (R. 113-14; Exhibit 1F). Dr. Davis ordered a cervical spine x-ray and diagnosed degenerative disc disease, muscle spasms, and degenerative joint disease. He prescribed Ibuprofen and Flexeril. (R. 141-42). Plaintiff did not return to Dr. Davis for further treatment. (See Exhibit 1F).

primarily grocery stores and discount stores," and that, while she acknowledged feelings of sadness and crying, she had "never had thoughts of suicide." She told him that she had been addicted to crystal meth "for about four years," but that she had not used it for six months. Dr. Jacobs noted that "[f]rom a psychiatric perspective, her chief problem is addiction to crystal meth." He diagnosed "Methamphetamine Dependence, Remission Claimed" and "Social Anxiety" on Axis I and, on Axis II, "Personality Disorder NOS, Cluster B Features." Dr. Jacobs indicated that plaintiff "would have a favorable prognosis assuming that she can remain abstinent from drugs." (R. 151-52).

At the consultative physical examination, plaintiff reported a history of back and neck pain to Dr. Vyas. She complained of daily lower back pain which causes spasms and prevents her from lifting anything heavy or walking for a long distance. She reported that she takes Tenormin daily for her blood pressure, and that it is "staying much better." Plaintiff told Dr. Vyas that she has "been anxious all her life" and that she "used to go to mental health but it has been about 15 years since she went there." She reported that she had problems with her husband and "tried to cut her wrist and arm" but that, at the time of the examination, she was not going to Mental Health. She reported that she "has taken methamphetamines for nearly three years[,]" using it "practically every day," and that she had "used twice in the last one month but has not used anymore." She also stated, however, that she has monthly drug tests due to her arrest for possession of marijuana and "has been drug free for nearly about a year." After performing a physical examination, Dr. Vyas diagnosed: (1) a "[h]istory of cervical and lumbar pain from previous injuries, some degree of Degenerative Joint Disease[,]" (2)

3

"[h]istory of hypertension and palpitation[,]" (3) "[h]istory of anxiety, depression with previous history of suicidal tendencies[,]" and (4) "[h]istory of drug abuse, mainly methamphetamines for about three years." (Exhibit 4F, R. 154-57). Dr. Vyas ordered a lumbar spine x-ray which was "negative," revealing normal vertebral body heights and disc spaces, no subluxation, no pars defect and intact pedicles. (R. 158).

Plaintiff's SSI claim was denied on June 7, 2006. (R. 67-72). Two months later, on August 7, 2006, plaintiff sought mental health treatment from SCAMHC for panic attacks. (R. 190). At an intake evaluation with a therapist on September 5, 2006, plaintiff reported that she has been "nervous most of her life." She reported that she had attempted suicide by overdose and by cutting her wrist at age sixteen and by cutting her arms and legs "2 yrs ago." (R. 202). Plaintiff was diagnosed with panic disorder with agoraphobia and major depression disorder, recurrent and moderate, as was assigned a GAF score of 60. (R. 203). Plaintiff completed an intake form reporting symptoms including auditory and visual hallucinations (R. 199), and indicating that she "would like a referral out" to "Social Security." (R. 200). Thereafter, plaintiff saw a staff psychiatrist at SCAMHC on 10/3/06, 2/9/07, 3/16/2007, 5/11/07, 7/6/07, 10/5/07, 1/4/08 and 3/7/08.[4] In her initial appointment with a psychiatrist, plaintiff reported a recent hospitalization for a panic attack, triggered by plaintiff's twenty-year-old son.[5] The doctor prescribed Setoquel, Lexapro and Paxil. (R. 189). In her next visit, on February 9, 2007, plaintiff saw a different staff psychiatrist, who adjusted her

---

[4] The transcript includes no records evidencing ongoing counseling by a therapist or counselor; it includes only plaintiff's two intake assessments, an annual update assessment, and the periodic visits with the staff psychiatrist. (Exhibits 2F, 8F, 10,F, 12F).

[5] Plaintiff provided no treatment records evidencing hospitalization.

medications. (R. 188). At plaintiff's next visit to the psychiatrist, in March 2007, the doctor noted that plaintiff was "doing well overall." The doctor indicated a "[f]air" memory, attention span and impulse control, but noted no other abnormal findings in plaintiff's current mental status. (R. 187). The psychiatrist made these same findings upon mental status examination in May 2007 and July 2007, except that plaintiff's mood was "[d]epressed" – he noted in both of these visits, however, that plaintiff was "doing well." (R. 185, 186).

In an annual update on August 22, 2007, plaintiff again reported a number of symptoms, including visual and auditory hallucinations (R. 223-24); she again requested a referral out to "Social Security" (R. 224). Plaintiff's diagnoses remained the same as upon initial intake, and her GAF score was assessed at 58. (R. 227). The therapist indicated in a space provided on the evaluation form for "Goal" that "Dianna will obtain social security[,]" indicating a "Target Date" of August 22, 2008. (R. 228).

At plaintiff's next visit with the staff psychiatrist, the doctor's findings as to plaintiff's mental status again indicated that plaintiff's memory, attention span and impulse control were "[f]air," and noted no other abnormal findings. (R. 220). The doctor wrote, again, that plaintiff was "doing well." (R. 220). Upon mental status examination on January 4, 2008, the psychiatrist noted that plaintiff's mood was "[d]epressed" but, otherwise, his findings were the same as in the previous visit. (R. 213). Plaintiff reported that she felt that the Lamictal was no longer working. (Id.). The psychiatrist adjusted plaintiff's medication, discontinuing the Lamictal and starting her on Depakote. (Id.). At plaintiff's next follow-up visit on March 7, 2008, the psychiatrist noted again that plaintiff was "doing well" and

5

appeared stable; he continued her on the same medications. (R. 219, 221). The doctor noted "[f]air" impulse control, attention span and memory, but no other abnormal findings, upon evaluation of plaintiff's mental status. (R. 219).

Earlier that same week, on March 3, 2008, plaintiff had reported to Dr. Henry Cochran complaining of hypertension and pain in her "middle and lower back." (R. 216). Dr. Cochran ordered an lumbo-sacral spine x-ray which revealed narrowing of the inter-vertebral spaces at T12-L1, L1-L2 and L2-L3 and thoracic and lumbar spondylosis but, otherwise, a "normal lumbo-sacral spine." (R. 217). Dr. Cochran noted that plaintiff complained of pain primarily in the area of the sacroiliac joint but wrote, "Xray – disc spaces OK." (R. 216). He diagnosed degenerative joint disease and prescribed Motrin and Parafon DSC. (Id.).

On March 18, 2008, an ALJ conducted an administrative hearing, during which he heard testimony from the plaintiff and from a vocational expert. (R. 23-56). At the hearing, plaintiff testified that her back hurts most of the time, that she can walk for 30 minutes, stand for fifteen minutes and sit for thirty minutes before she has to move around, but that she can then sit back down again. She stated that she has a problem bending but can use her hands and arms, and that her memory is bad and she gets nervous and has difficulty talking when she is around people. (R. 43-45). She testified that she goes to the grocery store with her mother sometimes and goes to church occasionally but has no friends and no other social activities. (R. 49-50).

The ALJ rendered a decision on June 16, 2008. He found that plaintiff has "severe" impairments of "hypertension, chronic neck and back pain, [and] panic/anxiety attacks."

(R. 15). He found that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the impairments in the "listings" and, further, that plaintiff retained the residual functional capacity to perform "light, unskilled work as defined in 20 CFR 416.967(b) with restrictions to "very short instructions, and infrequent contact with the public." (R. 17). He determined that she has no past relevant work, and that there are a significant number of jobs in the national economy which the plaintiff can perform. (R. 21-22). The ALJ concluded that plaintiff has not been under a disability as defined in the Social Security Act since the application filing date. (R. 22). On March 8, 2010, the Appeals Council denied plaintiff's request for review (R. 1-4) and, accordingly, the decision of the ALJ stands as the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is narrowly circumscribed. The court does not reweigh the evidence or substitute its judgment for that of the Commissioner. Rather, the court examines the administrative decision and scrutinizes the record as a whole to determine whether substantial evidence supports the ALJ's factual findings. Davis v. Shalala, 985 F.2d 528, 531 (11th Cir. 1993); Cornelius v. Sullivan, 936 F.2d 1143, 1145 (11th Cir. 1991). Substantial evidence consists of such "relevant evidence as a reasonable person would accept as adequate to support a conclusion." Cornelius, 936 F.2d at 1145. Factual findings that are supported by substantial evidence must be upheld by the court. The ALJ's legal conclusions, however, are reviewed *de novo* because no presumption of validity attaches to the ALJ's determination of the proper legal standards to be applied. Davis, 985

F.2d at 531. If the court finds an error in the ALJ's application of the law, or if the ALJ fails to provide the court with sufficient reasoning for determining that the proper legal analysis has been conducted, the ALJ's decision must be reversed. Cornelius, 936 F.2d at 1145-46.

## DISCUSSION

### Treating Psychologist's Opinion

Plaintiff argues that the ALJ erred by failing to give any weight to the opinion of Sharon Brown, Ph.D., her "treating psychologist" at South Central Alabama Mental Health Center. On January 9, 2008, Dr. Brown completed a form on which she circled ratings of "mild," "moderate," "marked" or "extreme" to indicate plaintiff's estimated degree of impairment or restriction in eighteen listed work-related mental functions. Although the form indicates that the responses are to be provided "[i]n addition to the information provided in your narrative report" (R. 209), Dr. Brown did not attach a narrative report to the form, nor did she complete the final section of the form, which includes several blank lines for "Comments[.]" (See Exhibit 9F, R. 209-11). Dr. Brown indicated that plaintiff's estimated degree of impairment is "extreme" with regard to two of the listed areas (ability to maintain attention and concentration for extended periods and ability to respond to customary work pressures), "marked" as to six of the identified functions, "moderate" as to seven of the listed functions, and "mild" as to three. (Id.). Dr. Brown indicated that plaintiff's limitations met the twelve-month duration requirement. (Id.). The ALJ acknowledged Dr. Brown's opinion, but declined to give it any weight, observing that it was inconsistent with the observations of the staff psychiatrist from the same facility on March 7, 2008, that plaintiff was doing well

8

and appeared stable. (R. 20).

There is a threshold issue regarding whether the evidence of record demonstrates that Dr. Brown is plaintiff's "treating psychologist" such that her opinion is entitled to the deference accorded to treating sources under the Commissioner's regulations. See 20 C.F.R. § 416.902 ("*Treating source* means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you. Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).")(italics in original). While Dr. Brown is the clinic director and he approved the intake and annual update diagnoses of the therapist (see R. 203, Dr. Brown's 9/8/06 approval of 9/5/06 intake diagnoses; R. 227, Dr. Brown's 9/5/07 approval of 8/22/07 annual update diagnoses), the record does not demonstrate that Dr. Brown ever personally evaluated the plaintiff at any time. (See Exhibits 2F, 8F, 10F, 12F). Plaintiff received treatment from a staff psychiatrist once in 2006 (R. 189), five times in 2007 (R. 185-188, 220) and twice in 2008 (R. 213, 219). While plaintiff's counsel speculates that Dr. Brown (a psychologist, not a psychiatrist) may have initialed some of these treatment records (see R. 43), there is no evidence of record that this is so.[6]

---

[6] The writing above the line designated for "Staff Psychiatrist" is illegible. (See R. 185-88, 213, 219, 220).

9

However, even assuming that Dr. Brown is plaintiff's "treating psychologist," the ALJ did not err by declining to give her opinion any weight. "If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight." Roth v. Astrue, 249 Fed. Appx. 167, 168 (11th Cir. 2007)(unpublished opinion)(citing 20 C.F.R. § 404.1527(d)(2)). "If the treating physician's opinion is not entitled to controlling weight, . . . 'the testimony of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.'" Id. (citing Crawford v. Commissioner, 363 F.3d 1155, 1159 (11th Cir. 2004)). "If the ALJ finds such good cause and disregards or accords less weight to the opinion of a treating physician, he must clearly articulate his reasoning, and the failure to do so is reversible error." Pritchett v. Commissioner, Social Security Admin, 315 Fed. Appx. 806 (11th Cir. 2009)(unpublished opinion)(citing MacGregor v. Bowen, 786 F.2d 1050, 1053 (11th Cir. 1986)). "When the ALJ articulates specific reasons for not giving the treating physician's opinion controlling weight, and those reasons are supported by substantial evidence, there is no reversible error. Schuhardt v. Astrue, 303 Fed. Appx. 757, 759 (11th Cir. 2008)(unpublished opinion)(citing Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005)).

In this case, the ALJ found Dr. Brown's opinion, as expressed on the questionnaire, to be inconsistent with the treatment notes made by the staff psychologist who evaluated the plaintiff near the time that Dr. Brown completed the questionnaire. (R. 20). The Eleventh

Circuit has found good cause for declining to credit treating physicians' opinions where those opinions are "inconsistent with their own medical records," Roth, *supra* (citing Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997)); see also Vuxta v. Commissioner of Social Security, 194 Fed. Appx. 874, 876-77 (11th Cir. 2006)(finding good cause for ALJ to discredit opinion of treating psychologist that was inconsistent with treatment records). Substantial evidence supports the ALJ's determination that Dr. Brown's opinion is inconsistent with the psychiatrist's treatment notes and, accordingly, the ALJ did not err in declining to credit her opinion.

### Credibility Determination

Plaintiff's remaining argument is that the ALJ erred by failing to "apply the two part pain standard" properly. (Doc. # 11, pp. 5, 10-14). Plaintiff argues that she "meets the first part of the two-part pain standard in that she has an underlying medical condition, in her case chronic neck and back pain, as well as both thoracic and lumbar spondylosis." (Id. at p. 14). She contends that "the medical record, including the MRI reports,[7] supports the fact that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain" and that "[a]s such the ALJ erred in his application of the two-part pain standard. (Id.).[8]

In the Eleventh Circuit, a claimant's assertion of disability through testimony of pain

---

[7] The court notes that there are no MRI reports included in the present record and assumes that counsel intended to refer to plaintiff's x-ray reports.

[8] Plaintiff's argument is directed only to her allegations of pain, not her allegations of subjective symptoms resulting from her mental impairment. (See Doc. 11, pp. 11-14).

11

or other subjective symptoms is evaluated pursuant to a three-part standard. "The pain standard requires '(1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.'" Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005)(quoting Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991)). If this standard is met, the ALJ must consider the testimony regarding the claimant's subjective symptoms. Marbury v. Sullivan, 957 F.2d 837, 839 (11th Cir. 1992). Although the ALJ is required to consider the testimony, the ALJ is not required to accept the testimony as true; the ALJ may reject the claimant's subjective complaints. However, if the testimony is critical, the ALJ must articulate specific reasons for rejecting the testimony. Id.[9]

Plaintiff's argument suggests that the ALJ found that she did not satisfy the Eleventh Circuit's pain standard. To the contrary, the ALJ found expressly that she had. See R. 18 ("After considering the evidence of record, the undersigned finds that the claimant's

---

[9] See also Social Security Ruling 96-7p, 61 Fed. Reg. 34483-01 (July 2, 1996):

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. The finding on the credibility of the individual's statements cannot be based on an intangible or intuitive notion about an individual's credibility. The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

medically determinable impairments could reasonably be expected to produce the alleged symptoms[.]"). However, the ALJ determined that plaintiff's statements regarding the intensity, persistence and limiting effects of the symptoms were less than fully credible. (Id.). The ALJ stated his reasons for rejecting plaintiff's testimony of disabling pain: (1) that Dr. Vyas' musculoskeletal and neurological examination of the plaintiff in April 2006 was largely normal, with the exception of tenderness in the cervical spine and restricted range of motion of the neck on lateral movement to the right (R. 18-19, 20; see also Exhibit 4F); (2) that during her consultative examination with Dr. Jacobs plaintiff denied ever having thoughts of suicide but, during her consultative examination with Dr. Vyas, she related an event in which she had cut her wrist and arm (R. 19; see also R. 152 ("She has never had thoughts of suicide"); R. 155 ("She tried to cut her wrist and arm and she had been going to mental health"));[10] (3) that plaintiff reported to Dr. Vyas both that she had been "drug free for at least nearly about a year" but, also, that she had used drugs twice in the previous month (R. 19; see also R. 155); (4) that plaintiff testified that "she cooks, clean[s], goes to the store, attends church, watches television, read[s], and walks around outdoors (R. 19; see also R. 45);[11]

---

[10] In September 2006, plaintiff told her therapist of two suicide attempts – one two years previously and one at age 16. (R. 198).

[11] Plaintiff argues that while the ALJ's list of plaintiff's activities is accurate, he did not include regularity with which she engages in these activities, nor did he mention that she stated she is no longer able to work in her garden and plant flowers. (Doc. # 11, p. 14). Plaintiff is correct. At the hearing, she testified as follows:

Q. What do you do all day long?

A. I try to help my mother clean and cook. I do as much as I can. Clean.

13

(5) that the consulting physician noted that lumbar spine x-rays "showed normal vertebral body heights and disc spaces" (R. 19; see also R. 158);[12] (6) that plaintiff has required no "ongoing or regular treatment from back pain she alleges is chronic and debilitating (R. 20; see Exhibits 1F, 11F).[13] The court finds the ALJ's description of the plaintiff's daily activities, as argued by the plaintiff, to be incomplete. Plaintiff contends that it was error for the ALJ to rely on the 2006 x-rays when the 2008 lumbar spine x-rays showed some degeneration; however, the earlier x-ray report – showing no abnormalities whatsoever in

---

> Q. So you clean the house. You cook. You do laundry?
>
> A. Some. I try to, yes.
>
> Q. How about going to the grocery store? You help mom shop?
>
> A. Sometimes I go and I'll walk around with her.
>
> Q. Well, do you go to church or –
>
> A. Sometimes, yes, sir. I'm trying to go a lot more.
>
> Q. How often do you go?
>
> A. I go about once, twice a month.

(R. 45). Plaintiff further testified that she watches television " a little," reads "a little bit" and that she "like[s] to go outside a lot and watch the birds. (R. 47). She stated that she walks around "[a] little when she gets outside, and that she used to work in the garden until her back started hurting a lot about four or five years previously. (R. 47-48).

[12] While this is true as to the lumbar spine x-ray ordered by Dr. Vyas in April 2006 (R. 158), the lumbar spine x-ray ordered by Dr. Cochran in March 2008, nearly two years later, showed narrowing at T12-L1, L1-L2 and L2-L3 with "minimal spurs forming along the anterior superior lips of the lower lumbar vertebral bodies." (R. 217). However, Dr. Cochran also observed that plaintiff was tender primarily at the sacroiliac joint and that the disc spaces were "OK." (R. 216). Dr. Cochran's treatment note does not include detailed results of a musculoskeletal or neurological examination. (See id.).

[13] The record includes medical records for treatment of back pain on only two occasions – September 26, 2005 (Exhibit 1F), five months before plaintiff filed the present application, and March 3, 2008, two weeks before the administrative hearing (Exhibit 11F).

plaintiff's lumbar spine at the same time that plaintiff's chief complaint to Dr. Vyas was of daily pain in her lower back which caused spasms and limited her ability to lift and walk – is a fair consideration in assessing the credibility of plaintiff's allegations of debilitating pain. (See *e.g.,* R. 20). The ALJ was aware of the 2008 x-ray and noted the findings in his opinion. (R. 19). The court concludes that the reasons articulated by the ALJ for finding plaintiff's pain testimony to be less than fully credible, while not all compelling, are both adequate to support his credibility determination and supported by substantial evidence of record. See Dyer, *supra*, 395 F.3d at 1210 ("The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable [the court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.")(citations and internal quotation marks omitted). The court, accordingly, rejects plaintiff's argument that the ALJ committed reversible error in applying the pain standard.

## CONCLUSION

Upon review of the record as a whole, the court concludes that the decision of the Commissioner is supported by substantial evidence and proper application of the law. Accordingly, the decision is due to be AFFIRMED. A separate judgment will be entered.

DONE, this 19th day of April, 2011.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE